We find this, nevertheless. This court definitely has jurisdiction to rule on a legal error, and the legal error is because he interpreted the case completely incorrectly, and in effect, created a new legal standard. What happened the first time at the Veterans Court was not... The joint remand was not something that created a remand in a box. It's not something that the court just said and went back down to the hearing officer. If you believe the government's response on this, the import of that is the court could send the case back to the hearing officer. The hearing officer could say nothing, and the veteran would not be prejudiced because everything was done at the Veterans Court level, but that's not true. What was done at the Veterans Court level was a list of things were noted to be done by the hearing officer, and it's uncontested that those things were not done. So we don't think that that's a basis for you all to say that you lack jurisdiction. I'd like to return to the constitutional issue for one second. What we're asking for is completely in line and congruent with this court's holding in Cushman and Gilroy. In Cushman, this court held that a veteran has a Fifth Amendment right to due process, and it limited that in Gilroy by stating the Fifth Amendment right kicks in where no statute or regulation addresses the error that occurred, and that is precisely what we have here. There is no statute or regulation, not new and material evidence, not clear and unmistakable error. Mr. Pitts has nowhere else to go, and this court in its jurisdiction, its proper jurisdiction, can rule on this constitutional issue, and to your point about not having raised it at the Veterans Court, it's true it wasn't raised at the Veterans Court because this is the first time it's been raised. I think this court can rule on the issue, find a constitutional right, and then going forward create some sort of credential mechanism that the right has to be raised at the Veterans Court before it comes here, and it's completely analogous to what happens in the immigration context with the Lozada Principles. An immigrant cannot raise for the first time an effective assistance claim on appeal. He has to raise it where it went the first time, but I think it's important for this court to recognize the right, and then create a mechanism that the Veterans Court can hear motions for reconsideration or some sort of mechanism to create a right to appeal it at the Veterans Court level before it comes up to this court. That would be a pretty intrusive course of action for us, it would seem to me, for us to be telling the Veterans Court to create a particular mechanism and describe the mechanism that they should employ. It seems to me that that's something that we'd be reluctant to do by way of just comedy between courts. Well, I think, Your Honor, you know, courts have been the mechanism to recognize the right to effective assistance of counsel, and I think your concern about comedy with the courts, I don't think you have to lay out in detail exactly what has to happen, but I don't think it's intrusive to say we recognize the right to effective assistance of counsel at the Veterans Court level, and the Veterans Court can come up with whatever mechanism they would require to have it either raised there, or they could say, no, we would like it raised at the federal circuit. Thank you, Your Honor. Thank you. We thank both counsel. The case is submitted. We'll hear our argument next in number 2012-5039, Comet Systems Corporation against the United States. Mr. Hudock, when you're ready. Thank you, Your Honor. Philip Hudock, counsel for Comet in this federal government contract case. This is a case which was set up by the high level of the Department of Defense in which the- Let me ask you about Amendment 5 here, okay? That's it. Before we get into the standing issue, as I've read the regulation, it seems to me that under these circumstances where there's a material change in the solicitation, that the normal procedure is to amend the solicitation and allow revised bids to be submitted. Correct. Correct? And you say that that's what should have been done here, but you don't indicate what the prejudice was for not doing that. In other words, you don't indicate what the revised bid would have done differently. This doesn't change anything about the basic contract. It just deletes some of the work. So how would you have changed the bid if you'd been given the opportunity to put in a revised bid? Well, what happened is it was a half-billion-dollar contract. There were three parts, basic contract, task order one, task order two. The two task orders were a quarter of a billion dollars. I understand what the facts are, but why would you have revised the bid? The bid was separate for the basic contract and for the two task orders, and you don't anywhere in your briefs tell us what you would have done differently if you could have submitted a revised bid. What's the difference? My client would have been able to re-bid to the new... No, we're talking about an amended bid. Yes, because it would have been a re-bid instead of the original bid. No, it wouldn't have been a re-bid. The regulation says that if there's a change, unless it's a change that would bring in additional bidders, which is subsection C, but under A, if it's an amendment, you get to put in a revised bid. Yes. You haven't told us how you would have revised the bid if the opportunity to do so had been given to you. Because the comment would have submitted a revised bid to comply with the new solicitation or the modified bid, and the reason they're out in the cold is that they didn't have that chance and could have had that chance. And so the... It sounds very abstract. Well, but not really. There was a bid for the basic contract, and there were separate bids for the two task orders, right? No, it was... You bid on all three. You bid on basic, task one, task two, half a billion. Separated the three, right? The government deleted task order one, task order two, and the problem was all of the specific work was in task order one, task order two. The only thing in the basic contract was, as the trial court said, the only part that was left was you put in a series of hourly rates for different kinds of jobs. In effect, the bid became a nullity because all the work was taken out of it, and it became an absurdity in terms of trying to figure out what are these people supposed to be doing? The answer is there was nothing for them to do because all the tasks were removed. All they did was hourly rates, and this should not have happened. Well, I'm hard-pressed to understand why, if, in fact, Amendment 5 had such a dramatic impact on the parties that had bid, why neither you nor any of the other parties that drew your bid are objected to keeping the bidding process going without further change at that point? Because the government prohibited doing any bid. They prohibited a revised bid. You could have withdrawn your bid, for example. You've taken all the work out of this. But, I mean, then you're out of the picture. I mean, my client isn't going to go away and refuse to do work. My client wanted work. Why couldn't you have written a letter saying that under this regulation they were obligated to permit revised bids, or perhaps even to re-bid them? You could have done that, right? No. Because here's what the government did. Wait a second. Why not? Why were you forbidden to call this problem to their attention? Because this is what the government said in the amendment. This amendment does not require the submission of a revised proposal. The government will not accept any revisions to the proposal. Not is in caps and in bold. So they're saying, don't you dare even try to get a re-bid. And that's bold, capital, never, which is ridiculous. You're reading it differently than it seems to say on the face of it. It doesn't say you can't object to the procedure. It just says you can't submit a revised bid. Well, but that's the operative thing would be to get a revised bid. The government locked everybody out from doing anything, no matter how ridiculous was the fact that a quarter of a billion dollars of work going, the government didn't think it was a change. And the only thing that was left were hourly rates. And what they then did was supposedly evaluate the work based on just the basic contract. But there's nothing there to evaluate. I went through the 17,000 pages. There was no indication the government actually changed anything. They didn't go back to step one and then try to re-evaluate. There's nothing there. They just had the original evaluation. So the whole process imploded because they just wanted to change. And what really, really happened was in September, everybody put their bids in. Four months later, there's an internal reorganization in the Pentagon about bringing in another group and putting it together. And they all decided they were going to do everything different. And you're quite correct. What they should have done is said, okay, guys, stop, we're changing the big stuff. We're going to give you a new proposal. And I think in my brief, you saw that this wasn't the first time. There was a prior situation where the Department of Defense was doing the same contract. Went on and on and on and on and on. Couldn't figure out what it wanted. Then terminated the solicitation, then followed up with this one. Again, they really couldn't figure out what they wanted to do. And they failed to follow exactly what your Honor said, is if you make a material change, you're supposed to do a re-bid or re-solicitation. And the whole process became an exercise in futility and absurdity. And you're not supposed to do a re-bid or re-solicitation. You're supposed to allow people to submit revised bids. Yes. And they absolutely prohibited it with this capital not in bold. But that's. So you could have objected to it. They were determined. In other words, what is being suggested is the bidders should not have believed the government that says, don't you dare re-bid. And the government, you should have said, no, you should really do that. The government created this situation on its own. And I don't think that the bidders should be serving the ones who suffer as a result of the decision of the government. Yes, they should have done that. And of course, what the court did, it mentioned this fact about the re-bid, but then ignored it and never ruled on it. And what the judge did rule on, the only thing was standing in terms of what you needed to do in terms of going forward. And my problem with the standing ruling is the way the court looked at the evidence, it was a lot harder to meet standing than it was to win the case. The court's saying, well, you had to show about and deal with the mistakes of eight other bidders, and you had to leapfrog over each of them. So this is all the standing case. I mean, again, standing shouldn't be so difficult that virtually it's impossible to be heard before you get to the merits. But it frequently happens. That's not an unusual scenario. There can be cases that are really quite easy on the merits, but if you happen to be a plaintiff that doesn't have standing to raise the claim, you're out of court. Yes, but I don't think standing should be harder than merits. Well, I mean, you could take a case in which the merits are really a lay-down hand. But if you don't have standing to be in court, to point that out to the judge and get the benefits of the ruling, because for whatever reason you lack standing, you can't come in, even though the burden is quite heavy on you. Yes, but that's why the burden is much lighter in terms of the other approach in terms of the court should say you failed to allow an amendment, and the remedy for that is to allow an amendment for all the people that were involved. And that's where the award should be reopened so that they can do that. And even though some time has passed, only a tiny fraction of the half a billion dollars has been awarded. There's only about $65 million of which only about $15 million has even been done. So the situation of what's happened since then is relatively minor. The government has been extremely slow in awarding so that you can go back and say, okay, let's give everybody the rebid, or we can do a new solicitation, and then the parties will have access to it. Because clearly my client would have adequate standing on their weeks in impressive in order to be able to go forward with a new solicitation, because the new solicitation of rebid wipes clean any defects in my client's original bid, because everybody starts at ground zero. When the original solicitation was published, what was the value of the contract at that point? It projected at $495 million, half a billion. Half a billion dollars. Yes. And you just said that the contract that was ultimately let was about a half a billion dollars. Quarter of a billion. Well, you said half. I'm sorry. It's half a billion dollars, but the two task orders were a quarter of a billion. Okay, but when you were just referring to the $15 million, you said that's $15 million out of the half a billion. Are you, do you mean $15 million out of a quarter of a billion, or $15 million out of a half a billion? Well, out of a quarter of a million. So, a relatively small fraction of the awards have actually gone forward, and the government's moved very, very slowly in terms of what they're doing with this contract, and so that it's not really that disruptive to do a new bid in which all 14 could go forward. I have a question. Go ahead, you're on. The subsection C says you only do a re-bid if there's a belief that additional people would come in and bid. Is there any evidence in the records that if there were a re-bid here, additional people would come in and bid? Well, of course that could happen, but I think what... Is there any evidence that it would? Well, we don't know because there was no opportunity... Is there any evidence that people would come in, and more people would come in? I have no evidence of that because it wasn't offered, but what would have happened is, in the original bid, there were nine out of 14 that were disqualified. If there had been a re-bid, not only my client, but eight others, there would have been 14 bidders again to come in. So, all 14 had already indicated their interest because they put through all the effort on bidding and getting teams together and so on. So, it is very proper to say, had there been another opportunity to bid, there would have been 14 bidders instead of only five that were left when the government finally made its award. Mr. Yannick, you're well into your rebuttal time. Would you like to say the remainder of it? Yes, thank you. Now, Mr. Skirloff, you're going to be the only counsel arguing on the athlete's side very well. Good morning, Your Honors. May it please the Court. The trial court correctly found that Coleman lacked standing to bring this protest. And this is so for two reasons. Because first of all, Coleman's challenge to Amendment 5 is untimely. And second of all, Coleman cannot show that it was, it had a substantial likelihood of receiving award because it received such a... Can I start with the same question that Judge Yannick began with your adversary? I'm focusing on Amendment 5 and what it actually did. I found it difficult to parse what the difference was between the Amendment 5 before the amendment, and Amendment 5 after the amendment, or the contract before and after the amendment. What was the effect of Amendment 5? And you and Mr. Hudrak have a vastly different assessment of the effect. Describe it for me. Yes, Your Honor. Under the solicitation originally, the solicitation was set up as a basic contract. And then the awardees for the basic contract would be eligible to compete for the task orders. So the original contract had the basic contract and its separate evaluation factors. But it contemplated that the task orders would be awarded at the same time as the basic contract. It did originally, yes. That's what the government expected at the time. The only thing that Amendment 5 did was it changed the task orders to sample tasks. But it kept in place the evaluation scheme. And as the court has correctly recognized, the scheme for evaluating Coleman's offer remained the same with or without Amendment 5. But let's stay with Amendment 5. What is the effect of folding the task orders into the overall contract? Your Honor, they were only folded into the contract to the extent that their prices, the prices that the offerors proposed, were used in the evaluation of the basic contract. And the reason for that was, as Mr. Hudrak pointed out, the basic contract was basically a schedule of prices. And so the government needed to know how that schedule played out as a practical matter in applying it to specific situations that might come up. So to cut to the chase, your position, I take it, is that the Amendment 5 did not alter in any way the amount of the contract in that, as I understand your position, the contract had a minimum amount, which was tiny, something like $25,000. $2,500. $100, even less. So you say that this was just basically an undefined amount of work as to which you had no obligation beyond the first $2,500. And that wasn't affected by Amendment 5. That is absolutely correct, Your Honor. You disagree with the $250 million reduction in the size of the contract? Absolutely, Your Honor. And that is because? That is because the work under the contract, under an IDIQ contract, is not guaranteed. In other words... Wait, I'm confused now. I thought that the original contemplation, or solicitation, said that task orders 1 and 2 were going to be awarded at the same time as the basic contract. And those task orders were for a substantial amount of money. And that the change in Amendment 5 basically said, we're going to treat these as sample task orders so that we can evaluate your pricing for the basic contract, but that the actual award of task orders 1 and 2 is going to be post-thump. Is that correct? That is exactly correct, Your Honor. So the amount of work that was being awarded initially was substantially changed. There was a huge difference in that respect, right? No, Your Honor. The only thing that changed was the schedule for how that work would be awarded. Because, once again, the award of the basic contract was what entitled the awardees to then compete for the task orders. And the total amount for the work under the basic contract remained absolutely the same, even after the task orders were taken out. What you seem to be saying is that, insofar as the bidding is concerned on the basic contract, Amendment 5 didn't change that. But it did. It's as though there were three separate tasks. Let's change the facts a little bit. And the government said we want separate prices for tasks A, B, and C. And after the bids came in, they said, well, we're going to change that. We're not going to award tasks B and C. Is that essentially an accurate description of what happened here? Not entirely, Your Honor. And the reason is because, in the hypothetical that you propose, you're proposing essentially a simultaneous award of all three items, A, B, and C. And under the contract, there was the threshold that you had to get the basic contract first, and only then the task order. And I take it your position is that the task orders 1 and 2 were also indefinite quantity orders, even at the outset? In other words, before Amendment 5? The task orders defined specific tasks. Right. They were not... ...actually be requested under those orders, if I understand your position. Yes. And that's why you say that there's no difference in the size of the contract. The contract could be as small as $25,000 before or after Amendment 5, right? That's exactly correct, Your Honor. And in any event, the major flaw in Coleman's challenge to Amendment 5 is, of course, blue and gold. Because what happened is that Coleman accepted the amendment when the amendment was issued. It signed and returned the amendment to the agency, indicating that it wanted to be bound by the amendment's terms. What alternative did it have? Well, Your Honor, it could have either withdrawn its bid. It could have protested at the time, either to the agency or to the Court of Federal Claims. There was absolutely nothing to prevent Coleman from raising an agency-level protest or raising a protest at the Court of Federal Claims, saying that this amendment violates the regulation. And Coleman didn't do that. And Coleman didn't do that even after it returned the signed amendment. I take it none of the other bidders did, either? No, no. Nobody protested the amendment until a word was made. The amendment was issued in January. A word was made in April. Only then did two disappointed offerors challenge Amendment 5. And that is precisely what Blue and Gold is meant to bar. Can we decide this case based on Blue and Gold without reaching the standing issue? No, Your Honor, because Coleman still challenges the evaluation of its offer. Those are essentially separate challenges. One is to the terms of the solicitation. Well, I understand what you're saying. But let's treat the Amendment 5 thing as one aspect of this. Could we dispose of the Amendment 5 issue simply by saying Blue and Gold obligated you to raise this issue during the solicitation, and you didn't do it? And so we don't have to reach the question of whether it's standing to challenge Amendment 5 at this point? Yes, Your Honor. The court could dispose of the challenge to Amendment 5 upon that grounds. But not of the entire case. But not of the entire case, Your Honor, because Coleman still challenges its evaluations. And as the trial court correctly found, Coleman did not have a substantial chance of receiving an award under the contract. And incidentally, this also bars. There's quite a bit of difference between the two, it seems to me, because insofar as they're saying they weren't a successful bidder, they're stuck with the record here. Whereas if they're claiming that there should be a rebid, they're essentially saying we could change what we submitted and bring ourselves more within the solicitation. That is correct to a point, Your Honor. But the reason that that argument fails is because, as the court correctly pointed out, Coleman has not shown how Amendment 5 would change its bid for the basic contract. And of course, as I explained, Amendment 5 changes nothing about the basic contract. And it certainly does not change the evaluation for the basic contract. And Coleman received a marginal rating, which is what disqualified it from award, on the basic contract. So whether the task orders were real task orders or sample task orders  and the evaluation of Coleman's proposal. So that is your view, that even if the other side were to prevail on the Amendment 5 issue, we should still entertain them. They didn't lose on the standing question. That is correct, Your Honor. That is correct. And as the trial court correctly found, Coleman was ranked far below the other offerors. Coleman has not presented reasons to challenge. Excuse me, it hasn't presented sufficient ground to demonstrate how the agency erred in evaluating Coleman's offer. It has merely said that its rating was wrong. But it was given that rating because it had 11 weaknesses and significant weaknesses in its proposal, as the agency found. The solicitation provided that one weakness or significant weakness not offset by strengths would warrant a marginal rating. Coleman was essentially required to demonstrate how each one of those weaknesses was incorrectly determined by the agency, and it hasn't done that. And for that reason, the court correctly found that Coleman lacked standing. Finally, we would respectfully request that the court strike the non-record documents from the joint appendix that were submitted over the government's objections. These documents are not part of the administrative record. They were not submitted to the trial court as part of the administrative record. And therefore, they should not form a basis for this court's decision, as they did not form a basis for the trial court's decision. Is there any particular procedural reason to strike them as opposed to simply to disregard them? There is not, Your Honor, except that we believe it is Procedurally more proper. Yes, exactly, Your Honor. To strike as opposed to simply saying they aren't part of the record and we can disregard them. And we see a lot of stuff in appendices that, including many appendices in cases to which the government is a party, it's pretty unusual for the government to come in and say we move to strike some of the stuff which isn't really part of the record. Normally, we feel competent to determine what's in the record and what's not. You've pointed out your position that these are not part of the record. And I'm a little unclear as to why, in this case, unlike in many others, you're coming in wanting it struck. Your Honor, in this case, we feel particularly strongly because the trial court struck these documents in the first instance. It determined that these documents were not part of the record. These documents should have never been at issue because they're drafts that are not subject to review. In a way, you just made the best argument for saying why we shouldn't strike, it seems to me. Because if evidence is outlawed by the trial tribunal, then it's open to the appellate court to consider whether the decision to exclude that evidence was correct. And if that is an argument that's made, then that evidence is properly part of the record on appeal. So if there is a dispute as to the propriety of that evidence being before the trial court, then there's nothing wrong with putting that evidence before us for us to adjudicate that dispute. You'd agree with that, would you not? I would absolutely agree with that, Your Honor. So why isn't that a perfectly good reason not to strike the evidence in this case? In this case, because the trial court's decision on these documents is governed by axiom. And an axiom essentially sets forth a standard that the court must first determine based upon the record that is submitted by the agency. So there's a ground for affirming its decision about the documents rather than a ground for excluding the documents from the record. Yes, Your Honor. As a practical matter, we filed this as a procedural step because we felt that was proper. As a practical matter, we are perfectly happy for the court to merely do so. Thank you very much. Thank you. Mr. Hudock? Yes, on time in blue and gold. The language in blue and gold that is appropriate here, it says, we also hold that a party who has opportunity to object and does so before the close of the bidding process. Well, there was no opportunity because the bids were all in September of 2010. Amendment 5 came out in January of 2011. Five months later, we would have to be mystics to have known what's going to happen five months later. And there was no opportunity because the government prohibited any kind of changing of your bid or doing anything like that. How about a protest? I mean, they didn't prohibit you from protesting. They couldn't. And this is the protest that would have come after Amendment 5 was issued. Yes, but the protest was to get a rebid. But I think it's reasonable for the contractor to say, look what the government's saying, with the big not in bold. Say, don't even try to do anything. And the government is saying. So your protest would be that not was wrong. Yes. And you could have taken that. Yes, and the problem was my client believed what the government said is that there would never be a rebid. And I think that was the mistake. And I don't think the government should profit from that mistake because we're dealing with that. Also, the task orders were all fixed price. Fixed price. And that's where my $250 million. Fixed price, but not fixed quantity, correct? No, they're all fixed price. Right, but fixed price for no work is zero. No, each task had a specific dollar amount for it. Now, could the government have not wanted to do one of them? Perhaps, but it was all fixed. If the government picked up a project, it was at a fixed price. That was how it was all bid. I understand, but they had the option of saying, well, there's no work under this task. They could have done that. OK, your time has expired. And we thank both counsel. The case is submitted.